625 S.E.2d 641

**The STATE, Respondent,**

v.

**Jeffrey J. WESTON, Appellant.**

**No. 26099.**

Supreme Court of South Carolina.

Heard Nov. 3, 2005.

Decided Jan. 17, 2006.

Assistant Appellate Defender Robert M. Dudek, of Columbia, for Appellant.

Attorney General Henry Dargan McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Assistant Attorney General Jeffrey A. Jacobs, Senior Assistant Attorney General William Edgar Salter, III, and Solicitor Warren Blair Giese, of Columbia, for Respondent.

Justice WALLER:

Appellant, Jeffrey Weston, was convicted of murdering his mother, whose body was never found. He was sentenced to forty years in prison. We affirm.

## FACTS

In late 1997, at age 38, Weston went to live with his mother, Frances Franchey, at her Harbison apartment. Franchey, in her late seventies, was a retired educator. According to Franchey's friends, during the months Weston lived with her, she became "very depressed, down, sad, agitated, nervous,

very upset." The manager of the apartment complex testified that Franchey did not want Weston to live with her and was terrified of him. Shortly before her disappearance, Franchey talked about having Weston move out of her apartment. On Tuesday, August 4, 1998, Franchey told her bridge partner, Suzanne Allen, she was going to ask Weston to leave.

Franchey was last seen alive on August 6, 1998. That same day, Mark Jordan, the maintenance supervisor for the apartment complex, noticed that the trunk to Mrs. Franchey's car was open, and was lined with clear plastic.[1] Jordan testified he had never seen Weston driving Franchey's vehicle prior to her disappearance, but that Weston was driving it on Monday, August 10th.[2] Jordan also testified that Franchey did not want bumper stickers on her car but that, shortly after her disappearance, a new bumper sticker appeared on the car which read, "My kid beat up your honor roll student."

Randy Myers, a resident of the apartment complex, testified that, at 4:30 a.m. on Saturday, August 8th, he saw Weston loading garbage bags into the trunk of Franchey's car. The same day, Leslie Fuller, the apartment complex manager, received a phone call from a concerned friend of Franchey. Fuller went to check on Franchey and, receiving no answer, she went around back to the patio where she saw that all of Franchey's plants were turned over, and there was an empty bleach bottle on the porch. The next day, Fuller called Kathy Jarvis, a Richland County sheriff's deputy who lived at the complex and worked as its courtesy officer. Fuller and Jarvis went to the apartment and found Weston home. They saw Franchey's purse and glasses on her bed and were told by Weston that Franchey had "met some man and run off with him" leaving him a note on the coffee table.[3] According to Fuller, Weston came into her office a day or two later, very

---

1. There was also testimony that Weston called in sick from his job at Target on Thurs. and Friday, August 6th and 7th, telling his supervisor he had a stomach virus.

2. Weston's sister, Toni Franchey, testified that her mother did not allow him to drive the car as he did not have a driver's license.

3. No other witness had ever seen Franchey in the company of a boyfriend.

disheveled, sweating profusely, his eyes huge, and stated, "I was really angry with my mother and now I'm just scared."

On Monday, August 10th, Kathy Jarvis filed a missing person's report. The same day, a Richland County sheriff's deputy, Michael Kalec, went to the apartment and spoke with Weston. At that time, Kalec noticed there was no curtain in Franchey's bathroom. Weston advised Kalec that his mother's purse and keys were missing. Kathy Jarvis went to the apartment with police investigators on August 12th and noticed Franchey's purse was on the bed; she also noticed a brand new shower curtain was hanging in Franchey's bathroom.

The sheriff's department continued its investigation throughout the month of August. On September 4th, they returned to the apartment, which Weston had since vacated, and saw that the linoleum in the kitchen had been torn out, as well as a piece of the living room carpet. An area rug was covering the hole in the carpet.[4] It was not torn out by either the sheriff's department or apartment complex personnel. Police tested the floor where the linoleum had been removed and found blood; blood was also found on drag marks leading from the hole in the carpet. Investigators subsequently tested a piece of blood-stained molding from the apartment; the blood on the molding was Franchey's.

On August 9, 2000, Weston was indicted for the murder of his mother; he was apprehended in Seattle, Washington in October 2000. The defense put up no evidence at trial. The jury found Weston guilty, and he was sentenced to forty years imprisonment.

## ISSUES

1. Did the court err in allowing Suzanne Allen to testify as to the change in Franchey's demeanor after Weston came to live with her, and in allowing Franchey's daughter to testify as to her mother's fear of Weston?

---

4. Weston had purchased a shower curtain and an area rug from his job at Target during the week of August 10–14th.

2.   Did the court err in allowing the solicitor to question the apartment manager, Fuller, as to whether anyone other than Weston had any animosity toward Franchey?

3.   Did the court err in allowing a police officer to testify that, other than Weston, she had never had anybody blankly stare at her and not respond to her questions?

4.   Did the court err in allowing testimony to the effect that Weston stated, "I need a lawyer" upon finding a search warrant the police had left inside his storage unit?

5.   Did the court err in refusing to grant a directed verdict of acquittal to the charge of murder since the evidence raised only a suspicion of his guilt?

## 1.   TESTIMONY RE FRANCHEY'S CHANGE OF DEMEANOR

Weston asserts the testimony of Suzanne Allen and Toni Franchey was improper under this Court's opinion in *State v. Garcia* and under Rule 803(3), SCRE. We disagree.

Suzanne Allen, a friend of Franchey, testified that, during the time period before Weston moved in with her, Franchey was a happy person, cheerful, and fun to be with. When the Solicitor asked Allen what was Franchey's state of mind concerning Weston, defense counsel's objection pursuant to *State v. Garcia*, 334 S.C. 71, 512 S.E.2d 507 (1999) was overruled. Allen testified "She was very unhappy." The colloquy continued as follows:

Q.   She was unhappy?

A.   Very unhappy.

Q.   Had her demeanor changed as she lived with her son?

A.   Oh, yes.

Q.   That summer of 1998, had you given her any advice about her son?

A.   Yes, I encouraged her to ask him to leave by maybe providing some funds for him to get a place of his own because she seemed so miserable having him live with her....

.......

Q. Did you have a conversation with Ms. Franchey on that Tuesday?

A. Yes....

Q. Did she tell you that she intended to do something? ...

A. Yes .... she said, I'm finally going to ask him to leave, I want my home back.

Q.... Did you ever talk to her after that Tuesday, August the 4th?

A. No I did not.

Thereafter, the state called Weston's sister, Toni Franchey, from whom Weston had been estranged for many years. Toni Franchey was living in Australia at the time of her mother's disappearance, but had come to Columbia for a family reunion in the summer of 1997. She testified that "at that time, I discussed with the family the fact that I became aware that Jeff was planning to move in with my mother and I strongly opposed it. I was afraid." Toni Franchey went on to testify about her July 1998 visit at which time she advised her mother that she should find Weston alternate housing. The state queried as follows:

Q. During that two week period just before your mother's disappearance, what was her—I need to be specific. What was her state of mind about Jeff?

Defense counsel: I object to that. That is not a proper state of mind question. Foundation is not proper and I submit it's hearsay.

The court: Overruled.

A. She was—she seemed—she seemed more nervous and—

Defense counsel objected that this was not within the *Garcia* exception. The court overruled the objection and Toni Franchey continued:

She seemed much more nervous and anxious than normal. My mother is very vivacious, outgoing and loves to, you know, have a laugh and, you know, go out and get something to eat and she just seemed more anxious and just uncertain. I know that while we were doing the house we—she said, well, please don't touch anything in Jeff's room and we didn't because she was afraid.

Weston contends the testimony of Suzanne Allen and Toni Franchey was improper. We disagree.

In *Garcia*, the defendant was charged with the murder of his girlfriend. He admitted shooting her, but claimed it had been an accident.[5] At trial, Garcia objected to the testimony of two witnesses who testified that the decedent was scared of him. These witnesses were allowed to go further and state that the day before her death, the victim had told her grandmother that Garcia kicked her, causing a bruise below her knee, and that, a week before her death, Garcia had told the victim that if she ever left him, he would kill her. 334 S.C. at 73–74, 512 S.E.2d at 508.

We held, "the victim's state of mind—that she was scared of appellant—was relevant because it-tended to disprove appellant's contention the shooting was an accident; the victim's fear suggests appellant may have intended the shooting." *Id.* at 74, 512 S.E.2d 507, 512 S.E.2d at 608. We then went on to hold:

> Consequently, **while the present state of the declarant's mind is admissible as an exception to hearsay, the reason for the declarant's state of mind is not.** *United States v. Cohen*, 631 F.2d 1223, 1225 (5th Cir.1980) ("But the state-of-mind exception does not permit the witness to relate any of the declarant's statements as to why he held the particular state of mind, or what he might have believed that would have induced the state of mind.) If the reservation in the text of the rule is to have any effect, it must be understood to narrowly limit those admissible statements to declarations of condition—'I'm scared'—and not belief—'I'm scared because [someone] threatened me.' "

334 S.C. at 76, 512 S.E.2d at 508 (emphasis supplied).

We find the testimony in the present case was properly admitted under *Garcia*. The testimony in this case did not give a **reason** for Mrs. Franchey's fear. Rather, Toni Franchey and Suzanne Allen testified only that Mrs. Franchey was afraid of Weston. To read *Garcia* as Weston suggests would require us to hold that a witness may testify to the fact that the decedent was afraid, but not that the decedent was afraid

---

5. As here, the defendant in Garcia offered no evidence at trial.

**of the defendant.** This is simply too constrained a reading of *Garcia.* We specifically held that "the victim's state of mind—that she was scared of appellant—was relevant ..." 334 S.C. at 74, 512 S.E.2d at 508. Accordingly, the testimony here was clearly admissible under *Garcia.*

In any event, even had the testimony been improperly admitted, Weston simply cannot demonstrate reversible error. The improper admission of hearsay is reversible error only when the admission causes prejudice. *State v. Craig,* 267 S.C. 262, 227 S.E.2d 306 (1976); *State v. McWee,* 322 S.C. 387, 472 S.E.2d 235 (1996), *cert. denied,* 519 U.S. 1061, 117 S.Ct. 695, 136 L.Ed.2d 618 (1997) (error without prejudice does not warrant reversal); *State v. Mizell,* 332 S.C. 273, 504 S.E.2d 338 (Ct.App.1998) (in order to obtain new trial based upon erroneous admission of evidence, appellant must demonstrate both error and prejudice).

Here, prior to the testimony of either Suzanne Allen or Toni Franchey, the assistant manager of the apartment complex, Leslie Fuller, testified. When asked what was Franchey's state of mind in reference to her son the weekend of August 7–9, 1998, Fuller testified, without objection, as follows:

A. Well, when I saw her she was—she was usually crying and wringing her hands and I would say depressed, anxious.

Q. And who was she depressed or anxious about when she would—Were you aware of who she was depressed or anxious about?

A. Yeah, she talked with me about it.

Q. And who was she depressed or anxious about?

A. About Jeff.

Q. And that would be her son?

A. Yes.

. . . . . . . .

Q. Did you give her any advice about her son?

A. We talked about—about her having Jeff move out.

Similarly, Claudia Young, the manager for the apartment complex until July 30, 1998, testified as to her observations of Franchey's demeanor up until her son came to live with her.

Concerning the week leading up to Franchey's disappearance, Young was questioned:

Q. And during that time period did you become aware of her state of mind leading up until when you left July the 30th?

A. Yes, I was.

Q. What was her state of mind in regard to the defendant?

A. She did not want him to live there. She was terrified.

Q. And she was terrified specifically of whom?

A. Her son.

Q. And did you ever witness her demonstrating or did she ever do anything in your presence that indicated that?

. . . . .

A. She cried.

. . . .

Q. What did you suggest she do?

A. I asked her to let me change the locks on her apartment.

Weston did not object to this testimony.[6]

Given the testimony of Fuller and Young, the testimony of Allen and Toni Franchey was merely cumulative such that Weston cannot demonstrate prejudice. *State v. Craig, supra* (improper admission of hearsay is reversible error only when the admission causes prejudice).

## 2. WESTON'S ANIMOSITY TOWARD HIS MOTHER

█ Weston next asserts error in the solicitor's question to Leslie Fuller as to whether or not Fuller knew of anyone else, other than Franchey's son, who had any animosity toward Mrs. Franchey, contending this injected the solicitor's personal opinion into the matter, and was not based upon the evidence. We disagree.

---

6. Although Weston did object to the proper foundation, no further objection is contained in the record.

Contrary to Weston's contention, immediately prior to this question, the solicitor questioned Fuller as to Franchey's disappearance. Fuller testified she had gone to check on Franchey around 10:00 a.m. on the morning of August 8, 1998, and gotten no answer when she knocked at the door. She continued calling and left a message on Franchey's answering machine. The following morning, after several phone calls to Franchey's telephone, Fuller contacted the apartment security officer, Jarvis, and they went and did a walk-through of the apartment. She finally got in touch with Weston at about 4:40 that afternoon and he expressed no concern over his mother's disappearance, telling her "she met some man and she ran off with him. She left me a note on the coffee table." Fuller continued to testify:

A. I don't recall if it was Monday or Tuesday, but one of those days he came back into my office.

Q. And what was his demeanor when he entered your office that Monday or Tuesday?

A. He was very disheveled and he was sweating profusely. His eyes were huge. And he just stood over my desk and he said, to begin with, I was really angry with my mother, and now I'm just scared."

Contrary to Weston's assertion, the above testimony is some evidence of animosity upon which the solicitor properly based her question. Accordingly, we find the trial court properly overruled his objection.

### 3. WESTON'S RESPONSE TO KATHY JARVIS

■ . Weston objects to the testimony of Kathy Jarvis, the Richland County sheriff's deputy who served as "courtesy officer" for the apartment complex, to the effect that, when questioned about his Mother's disappearance, Weston "wouldn't answer anything," was "totally unresponsive," and "did not seem concerned" about his mother.

Although Weston now complains Jarvis gave unqualified "expert" testimony, the only objection below was that Jarvis was giving her opinion. Accordingly, this issue is procedurally barred from review because it differs from the objection raised at trial. *State v. Dunbar*, 356 S.C. 138, 587 S.E.2d 691 (2003); *State v. Prioleau*, 345 S.C. 404, 548 S.E.2d 213 (2001);

*State v. Benton*, 338 S.C. 151, 526 S.E.2d 228 (2000) (party may not argue one ground at trial and an alternate ground on appeal).

■ In any event, Jarvis was simply relaying her personal experience in law enforcement and the fact that she had not encountered anyone so unresponsive. We find no basis for objection. *State v. McClinton*, 265 S.C. 171, 217 S.E.2d 584 (1975) (witness may state his impression or inference with respect to the appearance of a person, animal, object, or place if he has had adequate opportunity for observation, the details of such appearance cannot be reproduced before the jury to enable them to draw a correct inference, and he states as much as possible of the constituent facts).

### 4. WESTON'S STATEMENT AT STORAGE UNIT

■ Weston moved out of his mother's apartment the week-end of August 21, 1998, and moved into an apartment on Confederate Avenue, owned by his friend, Francis Perna. Perna helped Weston move into the apartment, retrieving Weston's personal belongings both from the apartment in Harbison, and from a Public Storage Unit on Broad River Road. When they arrived at the storage unit, they found a search warrant. Weston read the search warrant and said, "I need a lawyer."

Weston asserts the trial court erred in allowing Perna to comment that he stated "I need a lawyer." He contends this was an improper comment on his right to an attorney and that, in any event, it was impermissible under Rule 403, SCRE, as its prejudice outweighed its probative value. We disagree and find Weston has not shown reversible error from admission of this single comment.

■ In *Doyle v. Ohio*, 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), the United States Supreme Court held that the due process clause of the Fourteenth Amendment is violated when a state prosecutor seeks to impeach a defendant's exculpatory story, told for the first time at the trial, by cross-examining him about his post-arrest silence after receiving *Miranda* warnings. *Doyle* also prohibits the State from commenting upon the defendant's request for an attorney.

*See Wainwright v. Greenfield,* 474 U.S. 284, 106 S.Ct. 634, 88 L.Ed.2d 623 (1986); *Edmond v. State,* 341 S.C. 340, 345, 534 S.E.2d 682, 685 (2000). The rationale for *Doyle* is that it would be a violation of due process to allow comment on the silence which *Miranda* warnings have encouraged.

Subsequent to *Doyle,* in *Fletcher v. Weir,* 455 U.S. 603, 102 S.Ct. 1309, 71 L.Ed.2d 490 (1982), the Supreme Court clarified that *Doyle* was applicable only in situations in which the government had induced, via *Miranda* warnings, a defendant's belief that his exercise of a constitutional right would not be used against him. 455 U.S. at 607, 102 S.Ct. 1309 ("in the absence of the sort of affirmative assurances embodied in the *Miranda* warnings, we do not believe that it violates due process of law for a State to permit cross-examination as to post arrest silence when a defendant chooses to take the stand.") *See also State v. Bell,* 347 S.C. 267, 554 S.E.2d 435 (Ct.App.2001) (recognizing that *Doyle* is applicable only after *Miranda* warnings have been given).

*Doyle* is simply inapplicable here. Unlike *Doyle,* Weston was not under arrest at the time he told Perna that he needed a lawyer, nor had he been given *Miranda* warnings by authorities. Under *Fletcher,* it is clear *Doyle* is inapplicable to Weston's statement to his friend. *Accord State v. Baccam,* 476 N.W.2d 884, 886 (Iowa Ct.App.1991).

### 5. DIRECTED VERDICT

■  Lastly, Weston contends the trial court erred in denying his motion for a directed verdict, claiming the state failed to prove the corpus delicti of a murder and that there was no evidence he caused Mrs. Franchey's death. We disagree and find the matter was properly submitted to the jury.

■  When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight. A defendant is entitled to a directed verdict when the state fails to produce evidence of the offense charged. When reviewing a denial of a directed verdict, this Court views the evidence and all reasonable inferences in the light most favorable to the state. If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the Court

must find the case was properly submitted to the jury. *State v. Cherry,* 361 S.C. 588, 593–593, 606 S.E.2d 475, 477–478 (2004). *See also State v. Harris,* 351 S.C. 643, 653, 572 S.E.2d 267, 273 (2002); *State v. Gaster,* 349 S.C. 545, 555, 564 S.E.2d 87, 92 (2002); *State v. Venters,* 300 S.C. 260, 264, 387 S.E.2d 270, 272–73 (1990).

In a murder case, the corpus delicti consists of two elements: the death of a human being, and the criminal act of another in causing that death. *State v. Martin,* 47 S.C. 67, 25 S.E. 113 (1896). In *State v. Owens,* 293 S.C. 161, 359 S.E.2d 275 (1987), this Court held that the circumstantial evidence surrounding the victim's sudden disappearance, considered with the unlikelihood of his voluntary departure as shown by his personal habits and relationships, was sufficient to establish the corpus delicti of murder or that the victim is dead by the criminal act of another. *See State v. Speights,* 263 S.C. 127, 208 S.E.2d 43 (1974). *See also State v. Copeland,* 321 S.C. 318, 468 S.E.2d 620 (1996).

Here, the state presented evidence that Mrs. Franchey had an active social life, was active with friends, at bridge club, and regularly kept in touch with the apartment complex managers, her sister, and her friends. She was last seen on August 6, 1998, via a bank video camera, making a withdrawal from her bank account. She has not been seen nor heard from since. Under *Owens,* the state's presentation of the victim's habits, coupled with her mysterious disappearance, and the fact that she has not been seen nor heard from since August 1998, are sufficient to establish the corpus delicti of murder.

Further, the evidence presented by the state warranted submission of the case to the jury. Evidence was presented that Weston had gone to live with his mother in the fall of 1997, and that she became very upset and was depressed Weston was living with her. Friends and family advised Franchey to either change the locks, eject Weston, or find him another place to live. Two days before her disappearance, Franchey told a friend she had decided to tell Weston to leave. She was last seen alive on August 6, 1998. The same day, the maintenance supervisor of the apartment complex noticed that the trunk to Mrs. Franchey's vehicle was open, and was lined with clear plastic. The maintenance supervisor also testified

that Franchey, a retired educator, did not have any bumper stickers on her car but that, immediately after she disappeared, a sticker which read "My kid beat up your honor roll student" was on the car. The apartment manager testified that when she went to the apartment on Aug. 8th, the shower curtain in Franchey's bathroom was missing.

Randy Myers, an apartment complex resident, testified that at 4:30 a.m. on Saturday, August 8th, he saw Weston loading garbage bags into the trunk of Franchey's car. Several people also testified that they had never seen Weston drive Franchey's car before, Weston did not have a driver's license, and that immediately after Franchey disappeared, Weston was driving her car.

The apartment complex manager testified that, when she went to check on Franchey, she saw that Franchey's plants on her back patio were turned over, and there was an empty bleach bottle on the porch. When initially confronted by the apartment complex manager and Officer Jarvis, Weston told them his mother had "met some man and run off with him" leaving him a note on the coffee table. No other witness had any knowledge of an alleged boyfriend. Further, although the apartment complex manager and Jarvis remembered seeing Franchey's purse and glasses on her bed in the apartment on August 8th, Weston told police that his mother's purse was missing. The apartment complex manager also testified that Weston came into her office a day or two later, very disheveled, sweating profusely, his eyes huge, and stated, "I was really angry with my mother and now I'm just scared."

Immediately after Franchey's disappearance, Weston called in sick to his job at Target for two days, saying he had a virus. He returned to work on Monday, August 10th, and was seen by employees to have a limp, a bruise under his eye, and scratches on his arms. He told his supervisor his cat had scratched him. He told another co-worker he had stepped off a curb and fallen into some bushes. When Jarvis and the apartment manager spoke to Weston at Franchey's apartment, Weston was wearing a heavy black jacket on a hot August day such that his arms were not visible. When Weston went back to work at Target, he bought a new shower curtain, and a rug. When police investigated the apartment,

they found an area rug covering a hole in the carpet of the living room floor. Linoleum in the kitchen floor had also been torn up and was missing. Police tested the floor where the linoleum had been removed and found blood; blood was also found on drag marks leading from the hole in the carpet. Investigators subsequently tested a piece of blood-stained molding from the apartment which was determined to be was Franchey's. Blood was also found on the rubber ring that lined the trunk of Franchey's car.

The above evidence, although circumstantial, is clearly sufficient to withstand a motion for a directed verdict. The judgment below is affirmed.

**AFFIRMED.**

TOAL, C.J., BURNETT, PLEICONES, J.J., and Acting Justice STEPHEN S. BARTLETT concur.