719 S.E.2d 708

**Anthony J. CLARK, Petitioner,**

**v.**

**STATE of South Carolina, Respondent.**

**No. 4915.**

Court of Appeals of South Carolina.

Heard Oct. 20, 2011.

Decided Dec. 7, 2011.

Appellate Defender Robert M. Pachak, of Columbia, for Petitioner.

Attorney General Alan Wilson, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Salley Elliott, Assistant Attorney General Brian Petrano, all of Columbia, for Respondent.

HUFF, J.

Petitioner, Anthony Clark, was tried before a jury and convicted of murder. He now seeks review of the post-conviction relief (PCR) court's denial of his request for belated review of his direct appeal issue. He further seeks reversal of his conviction, asserting the trial court erred in denying his motion for directed verdict based upon the insufficiency of the evidence. We find the PCR court erred in denying Petitioner's request for a belated review, but affirm Petitioner's conviction for murder after review of his direct appeal issue.

## FACTUAL/PROCEDURAL BACKGROUND

Petitioner was convicted of murder and sentenced to life imprisonment. No direct appeal was filed from his conviction. Petitioner thereafter applied for PCR, which was denied by the PCR court. Petitioner then petitioned this court for a belated review pursuant to *White v. State,* 263 S.C. 110, 208 S.E.2d 35 (1974). By order dated November 23, 2009, we granted this writ of certiorari to determine whether the PCR court erred in denying Petitioner's request for a belated appeal.

## ISSUES

1. Whether the PCR court erred in failing to grant Petitioner a belated review of his direct appeal issue.

2. Whether the trial court erred in denying Petitioner's motion for directed verdict on the murder charge.

## STANDARD OF REVIEW

The burden of proof is on the applicant in a PCR proceeding to prove the allegations in his application. *Simuel v. State,* 390 S.C. 267, 269, 701 S.E.2d 738, 739 (2010). "On appeal, the PCR court's ruling should be upheld if it is supported by any evidence of probative value in the record." *Id.* at 270, 701 S.E.2d at 739. However, if there is no evidence to support the PCR court's ruling, the appellate court will reverse. *Id.*

## LAW/ANALYSIS

### I. Post–Conviction Relief Issue

██ In his application for post-conviction relief, Petitioner alleged trial counsel failed to file a direct appeal after he requested counsel do so. At the PCR hearing Petitioner testified that, after the trial, he informed his trial counsel that he wanted to appeal, but counsel failed to file the notice of appeal. On the other hand, trial counsel denied that Petitioner asked him to file an appeal. Counsel then stated, "As a matter of fact, after he expressed remorse to the victims at the time of sentencing, that's like the very end of the transcript, and we did not speak, actually, after that." When asked on cross-examination about the fact that counsel admit-

tedly did not speak to Petitioner at the end of the trial such that he could have ascertained whether Petitioner wanted to appeal, counsel maintained that he explained the PCR and appeals process to Petitioner "before the trial ever started." He acknowledged, however, that he did not inform Petitioner about these things at the end of the trial, as he and Petitioner "did not speak after sentencing." Counsel further agreed he had no reason to doubt that Petitioner did want to appeal. The PCR court found Petitioner's testimony was not credible, but found trial counsel's testimony was credible, and denied Petitioner's application for PCR.

Petitioner argues he did not knowingly and intelligently waive his right to direct appeal. He notes that trial counsel testified he did not talk to Petitioner after he was sentenced, and admitted he had no reason to doubt that Petitioner did want an appeal. Petitioner maintains it is obvious in this case he did not knowingly and intelligently waive his right to a direct appeal.

The State argues the testimony indicates trial counsel did consult with Petitioner about the appeal process, there was no credible testimony Petitioner expressly instructed trial counsel to file an appeal, and there was credible testimony from trial counsel that Petitioner did not ask him to file an appeal. Accordingly, the State contends there is sufficient evidence to support the PCR court. Nevertheless, the State concedes that Petitioner may be entitled to a belated direct appeal if this court does not interpret Petitioner's lack of request—after being advised of the appellate process—to be an "intelligent waiver" of his right to appeal.

■■■■ "*Following a trial*, counsel is required to make certain the defendant is made fully aware of the right to appeal." *Turner v. State*, 380 S.C. 223, 224, 670 S.E.2d 373, 374 (2008) (emphasis added). Absent an intelligent waiver by the defendant, counsel must either initiate an appeal or comply with the procedure in *Anders v. California*, 386 U.S. 738, 87 S.Ct. 1396, 18 L.Ed.2d 493 (1967). *Id.* "To waive a direct appeal, a defendant must make a knowing and intelligent decision not to pursue the appeal." *Simuel*, 390 S.C. at 271, 701 S.E.2d at 739–40 (quoting *Sheppard v. State*, 357 S.C. 646, 651, 594 S.E.2d 462, 465 (2004)).

Here, although there is evidence trial counsel explained the *appeal process* to Petitioner before the trial started, there is no probative evidence trial counsel informed Petitioner of his *right to appeal* following Petitioner's trial. Explaining an appeal process before a defendant has even gone to trial does not equate to making a convicted client fully aware of his right to appeal that conviction. Additionally, there is no probative evidence Petitioner made a knowing and intelligent decision not to pursue an appeal. Indeed, Petitioner testified he informed trial counsel after the trial that he wanted to appeal. Though trial counsel denied that he ever spoke to Petitioner at the end of the trial, this testimony shows that trial counsel could not have ascertained whether Petitioner wanted to appeal his conviction. Thus, even considering the PCR court's credibility findings, there is no probative evidence that Petitioner knowingly waived his right to direct appeal, or that trial counsel made certain Petitioner was fully aware of his right to appeal following the trial. Accordingly, we find the PCR court erred in failing to grant Petitioner a belated review of his direct appeal issue.

## II. Direct Appeal Issue

■ The State presented evidence that in the late evening of May 9, 2004 and running into the early morning hours of May 10, seventeen-year-old Roger Brown (Victim) was shot as he and his friend, Michael Hammond, were chased and then ran up some stairs toward Hammond's apartment. Victim thereafter died from his gunshot wound. According to Hammond, he and Victim used to "hang out" with Petitioner, who was known as "Sanchez," but the two had a falling out with Petitioner. A couple of days before the shooting, some incidents took place involving Hammond, Victim and Petitioner. In particular, on one occasion a dispute arose when Hammond and Victim gave Petitioner money to put gas in a car, but Petitioner ran the gas out of the vehicle. Thereafter, an individual named Corey Cribb had some words with Hammond and Victim about the matter. A couple of days later, Petitioner "came up there with [Cribb]," and Hammond and Cribb got into a physical altercation. After that, Hammond used a B.B. gun to shoot out the window of a car belonging to Petitioner's girlfriend. A couple of days after that, on the evening of May 9, 2004, Hammond stated he and Victim went

to a fast-food restaurant, and returned to the apartments. As they stood in the parking lot talking, Hammond saw Petitioner running from behind the building. Hammond and Victim ran to Hammond's building and, as they got up the steps, Hammond looked back to see a man aiming a gun up toward them. Once he got inside the home, Hammond heard a boom, and then Victim came in, saying he had been shot. Victim went into the bathroom and fell down. Hammond testified the man standing at the bottom of the stairs with the gun was Petitioner. Hammond admitted that he had been smoking marijuana the night of the shooting and he was "high" during the incident.

Cynthia Jacobs testified she was at the apartments that night, sitting outside on a porch, when Hammond called Victim over to him. Jacobs then saw Petitioner and Cribb "peeping out" from between some buildings. Thereafter, Jacobs heard Hammond tell Victim to run. Hammond and Victim ran all the way around a building and up to the front of a building, at which point Jacobs heard a shot. Jacobs then ran upstairs to her sister's apartment to inform her sister about the shooting in the building. When Jacobs came back downstairs, she saw Petitioner and Cribb running past the building exclaiming, "We got that m——f——." After she heard the shotgun blast, she saw Cribb with the gun in his hand. Jacobs further testified that she knew Petitioner, and that she was familiar with his appearance and his voice.

Timothy Scott was also at the apartments at the time the shooting occurred. Scott testified he was outside when he heard Hammond yell for Victim to come over to where Hammond was standing, and saw Victim head in Hammond's direction. Scott went inside his building and then heard a gunshot. Scott headed back outside to check on what he heard, and as he got to the front of the house, he saw two silhouettes of people run by his window, who were laughing and saying, "We got that son of a b——." Both individuals were laughing, but he only heard one person say something. Scott thought he recognized that person's voice as Petitioner's. One of the people was wearing a do-rag or some type of head gear that was darker in color and could have been navy or black. Scott further testified that he had observed altercations between Victim and Petitioner, and stated it was obvious the two had "some kind of beef or argument with each other

because for about a week it went back and forth tit for tat," with Victim doing something to Petitioner and Petitioner doing something to Victim.

Alfred Turnipseed testified he was at the apartments on the night in question talking to his sister when he heard a gunshot, and ran downstairs. He got to the doorway, and then saw Petitioner run by with another person. Turnipseed insisted he knew Petitioner when he saw him, and it was Petitioner that he saw running. Turnipseed also testified regarding problems that developed between Victim and Petitioner a couple of days to a week before the shooting. Turnipseed witnessed the end of a fist fight between Victim and Petitioner, and heard Petitioner say in reference to Victim, "Niggers that beef me don't live long."

Hammond gave a statement to Investigator Gray on May 10, 2004, identifying Petitioner as the shooter. When shown a photographic line-up, Hammond pointed out Petitioner as the person who shot Victim. On May 10, Petitioner also gave a statement to police about the incident, wherein he claimed Cribb had his grandfather's deer gun and said he wanted to shoot up in the air "to scare them," as Cribb would not let go of the fight that had occurred between them. According to Petitioner's statement, Petitioner went over to Hammond's with Cribb, noting Cribb was wearing a blue bandana at the time. Cribb peeked around the corner, Hammond and Victim saw Cribb, and Cribb ran after them with the gun. They ran to Hammond's, and Cribb chased them and shot one time. At the time of the shooting, Petitioner was beside the stairwell, looking up at the stairs, and Cribb was in the doorway, standing in front of Petitioner. The police obtained a search warrant for Petitioner's residence, where they recovered a blue bandana. Investigator Gray also testified that Scott gave a statement wherein he indicated he could not identify the people, as he only saw silhouettes, but that he thought he saw a blue do—rag on the shorter person. According to Investigator Gray, Petitioner was the shorter of the two, standing at five feet eleven inches, while Cribb was about six feet and one inch tall. Cribb gave a statement to police, denying that he was at the location at the time of the incident.

At the close of the State's case, Petitioner moved for a directed verdict, arguing the State had produced only one

witness to the shooting and that witness, by his own admission, was under the influence of marijuana and there was insufficient lighting for him to make a proper identification. The trial court found sufficient evidence had been presented and denied the motion.

Petitioner contends the trial court erred in refusing to grant his motion for directed verdict based upon the sufficiency of the evidence. We disagree.

It is well settled that, when a motion for a directed verdict is made in a criminal case, the trial court is concerned with the existence or nonexistence of evidence, not with its weight. *State v. Hernandez,* 382 S.C. 620, 624, 677 S.E.2d 603, 605 (2009). When reviewing the denial of a motion for directed verdict, an appellate court views the evidence, and all inferences therefrom, in the light most favorable to the State. *State v. Weston,* 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). Although the accused is entitled to a directed verdict when the evidence merely raises a suspicion of guilt, it is the trial court's duty to submit the case to the jury if there is any evidence, either direct or circumstantial, which reasonably tends to prove the guilt of the accused or from which the accused's guilt may be fairly and logically deduced. *State v. Pittman,* 373 S.C. 527, 546, 647 S.E.2d 144, 153 (2007); *Weston,* 367 S.C. at 292–93, 625 S.E.2d at 648.

Viewing the evidence in the light most favorable to the State, including (1) Hammond's eyewitness testimony identifying Petitioner as the shooter, (2) Jacob's testimony she observed Petitioner and Cribb "peeping" around the building, saw the resulting chase and heard a gunshot, and then observed Petitioner and Cribb running past the building and exclaiming they "got that m———f———," (3) Scott's testimony that he saw two individuals running by his window after the gunshot, and his identification of Petitioner's voice laughing and exclaiming, "We got that son of a b———," and (4) Turnipseed's identification of Petitioner as one of the two people he saw running by that night after hearing the gunshot, his testimony regarding problems that developed between Victim and Petitioner a couple of days to a week before the shooting, and his testimony concerning Petitioner's threat in reference to Victim, it is clear that the case was properly submitted to the jury. Though Petitioner points to discrepancies in the

evidence raising doubt as to the identity of the shooter, the courts must look to the existence or nonexistence of evidence and may not make credibility determinations. See *State v. Ham*, 268 S.C. 340, 341–42, 233 S.E.2d 698, 698 (1977) (holding, where appellant asserted error in trial court's denial of his motion for directed verdict because of alleged inconsistencies between the trial and preliminary hearing testimony of one of the State's witnesses, thereby rendering the testimony of the witness incredible, the matter clearly presented issues of credibility for decision by the jury, and where the determination of guilt is dependent upon the credibility of the witnesses, a motion for a directed verdict is properly refused); *State v. Strickland*, 389 S.C. 210, 215–16, 697 S.E.2d 681, 684 (Ct.App. 2010) (noting a motion for a directed verdict of acquittal is properly refused where the determination of guilt is dependent upon the credibility of a witness, as this is a question that goes to the weight of evidence and is clearly for determination by a jury).

## CONCLUSION

For the foregoing reasons, we reverse the PCR court's denial of Petitioner's request for a belated review of his direct appeal issue. After a review of Petitioner's direct appeal issue, we affirm Petitioner's conviction.

**REVERSED, GRANT BELATED REVIEW, and AFFIRMED.**

PIEPER and LOCKEMY, JJ., concur.