797 S.E.2d 48

**The STATE, Respondent,**

**v.**

**David A. LAND, Appellant.**

**Appellate Case No. 2014–002423**
**Opinion No. 5441**

Court of Appeals of South Carolina.

Heard June 9, 2016
Filed September 28, 2016
Rehearing Denied March 23, 2017

Clarence Rauch Wise, of Greenwood, for Appellant.

Attorney General Alan McCrory Wilson and Assistant Attorney General William M. Blitch, Jr., both of Columbia, for Respondent.

MCDONALD, J.:

A Lexington County jury convicted David A. Land of three counts of sexual exploitation of a minor, second degree. Land appeals his convictions, arguing the circuit court erred in denying his motion for a directed verdict because the State failed to provide sufficient proof from which a reasonable jury could conclude that he knowingly distributed or exchanged pictures or videos of minors engaged in sexual acts as prohibited by section 16–15–405(A) of the South Carolina Code (2015). We affirm.

**FACTS/PROCEDURAL HISTORY**

South Carolina Law Enforcement Division (SLED) special investigators Britt Dove and Lucinda McKellar conduct online undercover operations targeting individuals distributing child pornography through peer-to-peer file sharing databases.[1] Using programs utilized by the Internet Crimes Against Children Task Force (the Programs),[2] Agents Dove and McKellar target individuals possessing child pornography available to be viewed on various file sharing networks, such as LimeWire, Phex, FrostWire, and others.[3] When searching for distributors

---

1. All persons using such file sharing programs are considered "peers." Officer Dove described peer-to-peer file sharing as follows: "You can download free software that's out there. That software will allow me to go out over the internet, [and] connect directly with another computer or multiple computers that are on a network. ... [O]nce I connect with them, if they make files available for sharing, ... [y]ou can go connect with them. ... At that time, you can use it on your computer. You can make it available on your computer to share back out to the internet to other people that are on the network."

2. Agent Dove described using Camtasia, a program that records and documents what he is actually viewing on his computer screen as he reviews downloaded files.

3. On redirect, Agent Dove explained how a downloaded file gets placed in LimeWire's shared folder: "[I]f you take the default settings, once you download something, it's automatically going to place it in the

of child pornography, the Programs search out specific SHA (secure hash algorithm) values—also called "hash values"—known to be associated with images of child pornography. Agent Dove described the process as follows:

[The Programs] would search for hash values. Now, everything on the internet can be given a hash value. That's going to be basically a mathematical formula that's done to everything—it gives this independent number. Almost like DNA for a person, but it's for a file. The only way that changes is if something inside that file changes. So the [Program] would go through and it would look and see for that hash value, that DNA match basically. It would go through and anything it found that it was known that it was related to child pornography or contraband, it would log that this hash value was seen at this time, in this state, and eventually return a list that I could go and look at and use GEO location stuff to find out if it was in South Carolina, and was inside my jurisdiction to begin an investigation.

. . . .

[The hash value] was for the individual files. It would ... continuously and automatically go through the different softwares and look for the individual files that match that hash number.

Agent Dove further explained the process for downloading suspicious files and then viewing the files to verify whether or not they contained child pornography. In downloading these files, Dove obtains the internet protocol address (IP address), which is similar to a phone number, associated with the location of the particular file.[4] Dove testified that only one user can have one IP address assigned at a time, and the IP address provides the location of the computer being used to view or store the file. In addition to the IP address, Dove obtains the global unique identifying number (GUID) generat-

---

share folder until you either move it out of that folder or you delete it. It's going to remain in that share folder and be available for others."

4. According to Agent Dove, when a person logs onto a computer, the internet service provider assigns an IP address. Under appropriate circumstances, agents can then request a subpoena or search warrant for the service provider and obtain the name of the person paying for the service, namely, "who the subscriber is at that time and date that [the] download occurred."

ed when the software—such as LimeWire in the instant case—is installed on the computer. The GUID identifies the software on a particular computer or device; it will not change even if the location of the computer or its IP address changes.

> [T]he GUID ... is the global unique identifier. When you download a software, in this case LimeWire ... to your system, it gives it that thirty-two character alphanumeric number that's unique to that software on that computer at that time. It doesn't change if you move the computer around to different IP addresses. It stays the same. Much like the VIN on a car.... You can register a car in Tennessee or South Carolina, the VIN remains the same. And that way, the system knows who has what available. It can use it for management purposes, even if the IP address changes.

On December 7, 2009, Dove conducted an online investigation and found a computer with likely child pornography available for distribution. Dove downloaded four files from the computer. The title of one of the downloaded images contained numerous words typically associated with child pornography. At this time, Dove obtained the IP address and the GUID for the computer running the LimeWire program from which he downloaded the four files. After obtaining the necessary subpoena authorization, Dove discovered that the internet service provider was Time Warner Cable in Lexington, South Carolina.

Agent McKellar conducted a separate online investigation on December 4, 2009. During her investigation, McKellar located a computer that shared known child pornography, and she was able to download several of its files. McKellar testified that the information identifying the IP address, location, and GUID were the same for each of the files. In other words, "This [document or file] would have had to come from the same person, same computer, at the same location, using the same IP address as the previous three files." The computer had an IP address in Lexington and contained images saved with terminology typically associated with child pornography.

On January 27, 2010, McKellar conducted another online investigation and located a computer housing child pornography available for peer downloading. Like the files downloaded

on December 4, 2009, these new files were available from the user to anyone using the peer network. Using a single-source download,[5] McKellar was able to determine the documents had the same GUID as the computer distributing child pornography on December 4, 2009, although the IP address had since changed.

After gathering the necessary information, Dove and McKellar realized that they had accessed computers using IP addresses not only in the same apartment complex, but that the apartments were "right above each other." When asked if she noticed any connection with the GUID in any other investigation, Agent McKellar responded, "Yes, . . . we had different IP addresses[.] [B]ut it was the exact same GUID associated with my investigation on December the 9th[,] [Agent Dove's] investigation on . . . December the 7th, and my investigation on January 27th of 2010. It was the same GUID for each address." Additionally, the investigators determined that the same GUID from the computer sharing the child pornography was previously located in Fort Campbell, Kentucky.

Dove and McKellar then went to the Lexington apartment complex and checked for wireless access points. They found five potential wireless access points, four secured and one unsecured. The unsecured access point was titled "Admin." Because the locations were sitting right on top of each other with the same GUID, Dove and McKellar were concerned that there might be an issue with a wireless access point being "basically piggybacked" (accessed or amplified by a nearby unauthorized user). At this time, the investigators decided to execute their separate search warrants simultaneously.

Agent McKellar executed her search warrant on 101 Saluda Point at the apartment of a married couple, the Does.[6] Mr. Doe explained that the couple did have wireless internet access, but their wireless access point was not password-protected. Additionally, Mr. Doe told Agent McKellar that the

---

5. Agent McKellar explained, "Single source means I am getting this file from one person using the software with that [GUID] from that IP address, . . . which is located in Lexington, South Carolina."

6. As these cooperating witnesses were uninvolved in any criminal activity, they are unidentified for purposes of this opinion.

name of their wireless access point was "Admin." Special Agent Colin Duncan conducted an on-site forensic review of the Does' home computer to determine "what kinds of programs, if LimeWire was on this computer and also if there [were] any ... files that depict minors engaged in sexual activity." McKellar testified, "There [were] no file sharing programs on the computer at the residence and there [were] very few images. And none of those images were children engaged in sexual activity."[7]

Agent Dove executed his search warrant on 101 Saluda Point, Apartment 1138, which was the residence of Christy Land, her daughter, and her son. Dove seized a laptop and two computer towers from the Land home. These items were submitted for forensic examination, but the examiner did not find any items related to Dove's investigation. The agents learned from Ms. Land, however, that David A. Land (Land), her older son, might be found at his grandparents' home in Greenwood.

On February 11, 2010, Agent McKellar executed a search warrant at the home of Land's grandparents. Land's grandfather called him and asked him to return to the home with his laptop. Upon Land's return, McKellar advised him of his *Miranda*[8] rights. After agreeing to speak with McKellar without an attorney present, Land admitted to being familiar with file sharing programs and discussed using LimeWire at various locations, including Fort Campbell, where he had been stationed.

According to McKellar, Land stated he would travel every couple of weeks to visit his mother in Lexington, and he used her laptop while visiting. "When [Land] would go to the VA Hospital, he would visit [his mother] and use her laptop at her residence in Lexington County." Land admitted that he would access an open wireless network called "Admin," which was

---

7. Agent McKellar also learned that Mr. Doe had a work laptop that he brought home with him on occasion. Mr. Doe brought that laptop to McKellar's office to check for LimeWire and any files depicting minors engaged in sexual activity. Again, no such software or files were present.

8. *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

not associated with his mother's residence. Land further admitted to intentionally receiving child pornography after using specific search terms. He acknowledged and admitted to downloading the three files that Agent McKellar downloaded from his computer on January 27, 2010. Finally, he admitted that after looking at the hundreds of files of child pornography he downloaded while in Lexington, he performed a system restore in an effort to delete everything from his computer.

SLED agents arrested Land at his grandparents' Greenwood home on February 11, 2010. Land was charged with three counts of second-degree sexual exploitation of a minor.

On February 10, 2014, the Lexington County Grand Jury indicted Land on all three charges pursuant to section 16–15–405(A) of the South Carolina Code (2015). Land was tried by jury on November 5–8, 2014. At the end of the State's case, Land moved for a directed verdict, which the circuit court denied. Following his conviction on all three counts, the circuit court sentenced Land to seven years in prison, suspended upon the service of thirty months and two years' probation on each count. The circuit court further required that Land register as a sex offender.

### LAW/ANALYSIS

"When ruling on a motion for a directed verdict, the trial court is concerned with the existence or nonexistence of evidence, not its weight." *State v. Weston,* 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). "If there is *any* direct evidence or *any* substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the [appellate court] must find the case was properly submitted to the jury." *State v. Brandt,* 393 S.C. 526, 542, 713 S.E.2d 591, 599 (2011) (emphasis added) (quoting *Weston,* 367 S.C. at 292–93, 625 S.E.2d at 648). "When reviewing a denial of a directed verdict, an appellate court views the evidence and all reasonable inferences in the light most favorable to the State." *Id.* "The trial court should grant a directed verdict when the evidence merely raises a suspicion that the accused is guilty." *Id.* "A defendant is entitled to a directed verdict when the State fails to produce evidence of the offense charged." *Id.*

 Land argues the circuit court erred in denying his motion for a directed verdict because the State failed to provide sufficient proof from which a reasonable jury could

conclude that he knowingly distributed or exchanged pictures or videos of a minor engaged in a sexual act in violation of section 16–15–405(A).[9] We disagree.

Section 16–15–405 provides, in pertinent part:

(A) An individual commits the offense of second degree sexual exploitation of a minor if, knowing the character or content of the material, he:

(1) records, photographs, films, develops, duplicates, produces, or creates digital electronic file material that contains a visual representation of a minor engaged in sexual activity or appearing in a state of sexually explicit nudity when a reasonable person would infer the purpose is sexual stimulation; or

(2) distributes, transports, exhibits, *receives*, sells, purchases, exchanges, *or solicits* material that contains a visual representation of a minor engaged in sexual activity or appearing in a state of sexually explicit nudity when a reasonable person would infer the purpose is sexual stimulation.

(B) In a prosecution pursuant to this section, the trier of fact may infer that a participant in sexual activity or a state of sexually explicit nudity depicted in material as a minor through its title, text, visual representations, or otherwise, is a minor.

(emphasis added).

Land contends that the State failed to provide sufficient proof for a reasonable jury to conclude that he *knowingly*

---

9. In his reply brief, Land further argues, "The jury charge in this case is not an example of clarity so as to inform the jury as to what factors they are to consider or what the various terms mean." Specifically, Land asserts the circuit court "never defined soliciting and the jury was left to speculate as to the meaning of the term." Land admits that neither the defense attorney nor the State moved for clarification. Thus, we believe Land failed to preserve this issue for our review. *See Wilder Corp. v. Wilke*, 330 S.C. 71, 76, 497 S.E.2d 731, 733 (1998) ("It is axiomatic that an issue cannot be raised for the first time on appeal, but must have been raised to and ruled upon by the trial judge to be preserved for appellate review."); *State v. Sullivan*, 310 S.C. 311, 314, 426 S.E.2d 766, 768 (1993) ("To preserve an issue for appellate review, an appellant must object at his first opportunity."); *State v. Wakefield*, 323 S.C. 189, 191, 473 S.E.2d 831, 832 (Ct. App. 1996) (to be considered on appeal, all issues must be argued by the appellant in his initial brief).

distributed or exchanged pictures or videos of a minor engaged in a sexual act. He asserts that to prove he had the *mens rea* to violate section 16–15–405(A), the State had to prove Land knew that a person with file sharing software could access his computer and that he intended to permit such access.

In support of his argument, Land cites *Biller v. State*, 109 So.3d 1240 (Fla. Dist. Ct. App. 2013), in which a Florida District Court of Appeal considered the use of LimeWire in conjunction with allegations of possession and "transmission" of child pornography. Using LimeWire, Biller downloaded pornographic images of children to his home computer from other LimeWire subscribers who permitted access to their files. *Id.* at 1241. Biller argued that to " 'send' means a purposeful act to deliver the files, rather than the mere allowance of access to the files." *Id.* Because the State conceded that Biller "did not affirmatively dispatch the images using a function on his computer," the Florida court reversed Biller's conviction for transmitting child pornography. *Id.*

Significant legal and factual differences distinguish *Biller* from the case at hand. First, the Florida court's reversal of Biller's conviction for "transmission of pornography by electronic device" focused upon the statute's definition of "transmitting" and the interpretation of the word "send." *Id.* at 1241. No such transmission requirement exists for purposes of the South Carolina statute. Section 16–15–405(A) requires only that the State prove that Land solicited or received or distributed child pornography, not that he did all three. Moreover, in addition to the evidence found on his computer, Land's own statements established that he solicited the child pornography by using such terms as "pre-teen" and "Lolita" in conjunction with LimeWire to find pornographic images and videos of minors.

Land admitted to intentionally receiving the prohibited images, including the three downloaded by Agent McKellar. McKellar testified that Land "was familiar with file sharing . . . and discussed using LimeWire as far back as his time at Fort Campbell when he was in the military." She also testified that during her investigations on December 4, 2009 and January 7, 2010, she saw the GUID in connection with Fort

Campbell, meaning "the person using that program was located in Fort Campbell at some point." Further, Land admitted to McKellar that he had used LimeWire for music and to download images of child pornography. McKellar testified:

Q: Did [Land] mention whether he would use [LimeWire] to download videos of child pornography, as well?

A: Yes. At one point in time he said that he had downloaded six hundred files while at his mother's house, looked at them and then deleted those files.

Q: Okay. Did you ask him about did he ever accidentally download any files?

A: Yes. I asked him if he had ever gotten any files that he didn't intentionally mean to get. And he said that all the files that he got were—that he received were intentional.

Q: Okay. Did he say how often he downloaded files?

A: Every couple of weeks when he would go to his mother's, he would open some of the files up, look at them and then do a mass download. . . .

McKellar was then presented with a printed copy of the titles on the browse list from her January 27, 2010 investigation, which included the three files she downloaded. She testified that she showed Land this list, as well as the three files, and that he recognized them and admitted to downloading them.

Q: Did [Land] give any information about how he would search for those files?

A: [Land] underlined a couple of words and indicated that they were search terms by writing on that word ["]search term.["]

Land identified the terms "pre-teen" and "Lolita," two terms which McKellar testified were commonly associated with child pornography.

In *State v. Tuckness*, 257 S.C. 295, 299, 185 S.E.2d 607, 608 (1971), our supreme court examined criminal intent:

The question of the intent with which an act is done is one of fact and is ordinarily for jury determination except in extreme cases where there is no evidence thereon. The intent with which an act is done denotes a state of mind, and can be proved only by expressions or conduct, considered in the light of the given circumstances. *State v. Johnson*, 84

S.C. 45, 65 S.E. 1023 [ (1909) ]. Intent is seldom susceptible to proof by direct evidence and must ordinarily be proven by circumstantial evidence, that is, by facts and circumstances from which intent may be inferred.

Thus, as the State properly argues, the issue of whether Land possessed the requisite intent at the time the crime was committed is typically a question for the jury because without an actual statement of intent by the actor, proof of intent must be determined by inferences from conduct. *See State v. Haney*, 257 S.C. 89, 91, 184 S.E.2d 344, 345 (1971) (absent an admission by the defendant, proof of intent necessarily rests on inference from conduct).

Here, as noted above, Land admitted to soliciting and downloading multiple pornographic files while at Fort Campbell and at his mother's home in Lexington. The IP addresses for the computer searched by Dove and McKellar supported this confession. Additionally, Land confessed to his use of particular search terms associated with child pornography and admitted to downloading the January 27, 2010 files discovered during Agent McKellar's investigation. The circuit court explained:

> [C]onsidering the evidence as to the GUID numbers, evidence as to the IP addresses, evidence as to the use of the unsecured Admin WiFi, it appear[s] that—and again, ... I'm not concerned with the weight of the evidence. I'm just concerned with the *existence* of the evidence. And I believe that there is sufficient evidence to send this case to the jury.

(emphasis added).

We agree and find that the State presented ample evidence demonstrating Land's knowledge and intent to commit the offenses of sexual exploitation of a minor in the second degree. The evidence, including Land's own admissions, established that Land knew how LimeWire worked and knew that the child pornography he downloaded would be available for others to download and view. In fact, such file sharing was the purpose of the LimeWire program. Land's knowing use of a program with the specific function of downloading and sharing stored files, in conjunction with his acknowledged use of the file-sharing program to download and view the images of child

pornography, required that the circuit court deny his motion for a directed verdict.

## CONCLUSION

Accordingly, we affirm Land's convictions for second-degree sexual exploitation of a minor.

**AFFIRMED.**

LOCKEMY, C.J., and WILLIAMS, J., concur.