776 S.E.2d 413

**The STATE, Respondent,**

v.

**Alphonso Chaves THOMPSON, Appellant.**

**Appellate Case No. 2012–213141.**
**No. 5341.**

Court of Appeals of South Carolina.

Heard June 11, 2015.
Decided Aug. 12, 2015.
Rehearing Denied Sept. 30, 2015.

Michael Patrick Scott, of Nexsen Pruet, LLC, of Charleston, and Chief Appellate Defender, Robert Michael Dudek, of Columbia, for appellant.

Attorney General, Alan McCrory Wilson, Assistant Attorney General, Mark Reynolds Farthing, and Assistant Attorney General, Mary Williams Leddon, all of Columbia, and Solicitor Barry Joe Barnette, of Spartanburg, for respondent.

HUFF, J.

Alphonso Chaves Thompson appeals from his trafficking in cocaine, possession of a weapon during the commission of a violent crime, and possession with intent to distribute marijuana convictions. Thompson contends the trial court erred in (1) denying his motion to suppress all evidence found as the result of an illegal search, (2) denying his motion to suppress his confession, and (3) denying his motion for a directed verdict on the charge of possession of a weapon during the commission of a violent crime. We affirm.

## FACTUAL/PROCEDURAL BACKGROUND

Following issuance of a search warrant for 120 River Street [1] in Spartanburg, South Carolina, officers discovered cocaine, marijuana, various guns, and certain drug and gun related items at the residence.[2] Thompson had been arrested at his business pursuant to an arrest warrant and was transported to the River Street address as the search warrant was being executed. During the search, Thompson confessed that the marijuana and cocaine found in the home were his. He was thereafter charged in a two count indictment with trafficking in more than four hundred grams of cocaine and possession of a firearm during the commission of or attempt to commit a violent crime. He was also charged in a separate indictment with possession with intent to distribute marijuana.

Thompson moved to suppress all of the evidence obtained as a result of the search warrant, which included the marijuana, cocaine, and weapons recovered from the warrant, as well as his confession. Thompson argued the affidavit in support of the search warrant included stale information and conclusory

---

1. The address is alternately referred to as River Street and River Drive in the transcript.

2. Although not included in the search warrant affidavit, evidence was submitted at trial that Thompson's mother had entered into a lease-purchase agreement to buy 120 River Street and this is where Thompson's parents resided.

statements, it failed to set forth the reliability or basis of knowledge of the confidential reliable informants referred to in the affidavit, and it lacked specific facts giving the issuing judge [3] a basis to believe the evidence would be found at 120 River Street, and therefore there was no probable cause to support the issuance of the search warrant. The trial court denied this motion. Thompson also made a separate motion to suppress his statement to police, which the trial court also denied. Following the close of evidence by the State, Thompson moved for a directed verdict with respect to the weapons charge. The trial court likewise denied this directed verdict motion, as well as Thompson's renewal of this motion after presentation of his defense.

Upon submission of the case to the jury, Thompson was found guilty on all charges. The trial court then sentenced him to concurrent sentences of twenty-five years on the trafficking charge, five years on the weapons charge, and five years on the possession with intent to distribute charge.

## LAW/ANALYSIS

### I. Search Warrant

On May 13, 2010, Investigator Chris Raymond, with the Spartanburg County Sheriff's Office, executed an affidavit setting forth the following information in support of issuance of a search warrant for 120 River Street:

> In June of 2007 Investigators from the Spartanburg County Sheriff's Office Narcotics Division had two different Confidential Reliable Informants (CRI) give information that they had been buying large amounts of cocaine from a black male that they only knew as "POO BEAR." These two CRI's stated that several large cocaine transactions took placed [sic] over the course of several months. These CRI's furnished information that was able to be corroborated such as vehicle descriptions and photo identifications. Both CRI's stated that they knew POO BEAR to drive a gray in color Honda Accord Station wagon when he would conduct these drug deals. It was learned through this Investigation that "POO BEAR" was positively identified as Alfonso Thompson and he also had an F350 Ford Dually blue and

---

**3.** The search warrant affidavit was not taken to a magistrate, but was presented to a circuit court judge.

Gold in color. In August of 2007 the SCSO Narcotics Division arrested Keith Jeter who stated that he was being supplied 4½–9 oz. of cocaine at a time from Alfonzo Thompson aka "POO BEAR." Jeter further stated that "POO BEAR" would bring the cocaine to his residence on Huxley St. in Spartanburg City. In September of 2008 the SCSO Narcotics Division interviewed a[sic] individual named Fred Meadows who stated that he was being supplied cocaine from "POO BEAR" and that "POO BEAR" drove a blue and gold Ford F–350 Dually. Meadows further stated that he grew up with "POO BEAR" in the city and has known him for a long time. Meadows stated that "POO BEAR" would deliver the cocaine to his house on Virginia St. in the city of Spartanburg. Also in late 2008 Spartanburg City Police Narcotics had an informant who came forward and stated the [sic] "POO BEAR" had a residence at the end of River St. on the left hand side and that "POO BEAR" was a large scale cocaine Trafficker. In January of 2009 the Spartanburg County Narcotics Division had two more different CRI's that came forward and stated that they had purchased 18 ounces of cocaine from "POO BEAR". They identified Alfonzo Thompson in a photo lineup as being the "POO BEAR" that they had dealt with. These two CRI's also confirmed that "POO BEAR" had an F–350 Ford Dually and it was Blue and Gold in color. On February 11, 2009 The Spartanburg County Narcotics Division arrested Jose Luis Diaz–Arroyo with a kilo of cocaine. During the interview with Arroyo he stated that his brother in law Alejandro Sosa Galvan was supplying a black male named "POO BEAR." Arroyo further stated that Sosa Galvan had multiple Kilos of cocaine delivered to "POO BEAR" at this River St. address on several different occasions. On July 30, 2009 a fifth CRI stated he was being supplied by a Deangelo Young aka "LITTLE MAN" and that Young was getting his cocaine from his cousin "POO BEAR." This CRI made a controlled buy from "LITTLE MAN" by taking him $4000 in Spartanburg County Sheriff's Office recorded funds. "LITTLE MAN" left the buy location and was followed to 1868 Tamara Way where he met with "POO BEAR" (THOMPSON). Thompson was driving a white in color Honda Civic Sc[sic] tag. . . . This Civic is registered to

a Pamela D. Jones of 1868 Tamara Way. Pamela Jones is a known girlfriend of "POO BEAR". "LITTLE MAN" left "POO BEAR" and met with the CRI at the buy location where he turned over 4 ounces of Cocaine to him.

Over the past 6 months the Spartanburg County Sheriff's Office Narcotics Division has conducted surveillance on 120 River St. and on several occasions has seen Thompson driving different vehicles to include the Ford F–350 Dually blue and gold in color and the white in color Honda Civic to and from this location. Investigators have also seen the gray in color Honda Accord station wagon come and go from this residence.

Over the past 6 months Investigators have witnessed Thompson visit this 120 River St. address just before making cocaine deliveries throughout Spartanburg City.

On May 11, 2010 Investigators bought ½ ounce of cocaine base from Authur Jones. When Jones was approached he started cooperating with the SCSO Narcotics Division. Jones stated that he was buying his cocaine from Alfonzo Thompson aka "POO BEAR." Jones stated that "POO BEAR" was fronting him about 9 ounces of Powder Cocaine a month. Jones stated that he would take the powder and then turn it into cocaine base and then sell it. When it was all gone he would call "POO BEAR" and tell him that he was ready for him. Jones stated that he was paying $1000 an ounce for the cocaine. On 05–11–2010 Jones placed a recorded telephone call to Thompson stating that he was ready to re-up. Thompson agreed to come by. Jones stated that Thompson's M.O. was to come by in the next couple of days. On 05–12–2010 Jones called "POO BEAR" again with no response. At approximately 6:30 PM Jones received a telephone call from "POO BEAR" . . . asking Jones if he was going to be home. Jones stated yes and hung up. Jones knew this to mean that "POO BEAR" was coming shortly. At Approximately [sic] 7:19 PM Thompson pulled into Jones [sic] driveway driving the white Honda Civic. Thompson exited the vehicle and came inside. Once inside Jones handed Thompson $9000.00 in recorded funds. Thompson stated that he would bring the package in the morning. Jones knew this to mean that Thompson would bring the cocaine to him the next day. Investigators were

inside the residence watching the transaction take place as well as the transaction being Video and Audio recorded. There was [sic] also outside surveillance units near the scene. Thompson was loosely followed in the Honda Civic after the transaction.

This investigator feels that Thompson has demonstrated a pattern over the course of the last 2 years of large scale cocaine trafficking. It is believed that Items related to the Drug Trafficking Trade will be located inside this residence as well as Cocaine and or Cocaine Base. It is also known by Investigators that Drug Traffickers hide their drugs and proceeds from drugs [sic] sales in various places about the residence and cartilage [sic] areas. Due to the violent Nature of Drug Trafficking Organizations a "NO KNOCK WARRANT IS REQUESTED."

On appeal, Thompson contends the trial court erred in denying his motion to suppress all of the evidence found as a result of the illegal search of 120 River Street. In particular, he argues the affidavit failed to demonstrate veracity and basis of knowledge of the numerous individuals providing information for the warrant, it failed to provide a sufficient link to the River Street home to provide probable cause that drugs would be found at the property, and all the relevant information in the affidavit was stale. Accordingly, he maintains the affidavit in support of the search warrant does not pass the "totality of the circumstances test" to show a substantial basis for the issuing judge to conclude probable cause existed. We disagree.

■ Both the United States Constitution and the South Carolina Constitution provide a safeguard against unlawful searches and seizures, guaranteeing "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures," and avowing no warrants shall issue except upon probable cause, supported by oath or affirmation, "and particularly describing the place to be searched," as well as the persons or things to be seized. U.S. Const. amend. IV; S.C. Const. art. I, § 10. South Carolina allows issuance of a search warrant "only upon affidavit sworn to before the magistrate, municipal judicial officer, or judge of a court of record establishing the grounds for the warrant." S.C.Code Ann. § 17–13–140 (2014). "Evi-

dence obtained in violation of the Fourth Amendment is inadmissible in both state and federal court." *State v. Gentile,* 373 S.C. 506, 512, 646 S.E.2d 171, 174 (Ct.App.2007).

■■■■ A search warrant may issue only upon a finding of probable cause, and it is the duty of the reviewing court to ensure the issuing judge had a substantial basis upon which to conclude that probable cause existed. *State v. Baccus,* 367 S.C. 41, 50, 625 S.E.2d 216, 221 (2006). "[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates,* 462 U.S. 213, 232, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983).

> Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence, useful in formal trials, have no place in the [judge's] decision [to issue a search warrant]. While an effort to fix some general, numerically precise degree of certainty corresponding to "probable cause" may not be helpful, it is clear that "only the probability, and not a prima facie showing, of criminal activity is the standard of probable cause."

*Id.* at 235, 103 S.Ct. 2317.

■■■■ "A warrant is supported by probable cause if, given the totality of the circumstances set forth in the affidavit, there is a fair probability that contraband or evidence of a crime will be found in a particular place." *State v. Kinloch,* 410 S.C. 612, 617, 767 S.E.2d 153, 155 (2014). Under the "totality of the circumstances" test,

> [t]he task of the issuing [judge] is simply to make a practical, common sense decision whether, [given all] the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.

*State v. Johnson,* 302 S.C. 243, 247, 395 S.E.2d 167, 169 (1990) (quoting Gates, 462 U.S. at 238–39, 103 S.Ct. 2317). The duty of a court reviewing a determination of probable cause for a search warrant is to ensure the issuing judge had a substantial basis for concluding that probable cause existed. *State v. Bellamy,* 336 S.C. 140, 144, 519 S.E.2d 347, 349 (1999). "The

appellate court should give great deference to [an issuing judge's] determination of probable cause." *State v. Gore*, 408 S.C. 237, 247, 758 S.E.2d 717, 722 (Ct.App.2014).

In *Johnson*, our supreme court found an affidavit defective because "it [did] not set forth any information as to the reliability of the informant nor was the information corroborated." 302 S.C. at 247, 395 S.E.2d at 169. If an affidavit fails to include

> any information concerning the reliability of the informant, the inferences from the facts which lead to the complaint will be drawn not by a neutral and detached magistrate, as the Constitution requires, but instead, by a police officer engaged in the often competitive enterprise of ferreting out crime, or . . . by an unidentified informant.

*Id.* at 248, 395 S.E.2d at 169 (citation omitted). However, an informant's veracity or reliability and his basis of knowledge should not "be construed as entirely separate and independent requirements to be rigidly exacted in every case." *Bellamy*, 336 S.C. at 143, 519 S.E.2d at 348–49. Rather, they are closely intertwined elements and relevant considerations in the totality-of-the-circumstances analysis, and "a deficiency in one of the elements may be compensated for . . . by a strong showing as to the other, or by some other indicia of reliability." Id. at 143–44, 519 S.E.2d at 349. Further, the failure to specifically include past reliability and/or basis of knowledge of an individual providing information is not always fatal to a search warrant affidavit. Our courts have determined "nonconfidential informants and eyewitnesses have more credibility than confidential informants." *State v. Jones*, 342 S.C. 121, 128, 536 S.E.2d 675, 679 (2000). "[E]vidence of past reliability is not usually required when information is provided by an eyewitness because, unlike the paid informer, the eyewitness does not ordinarily have the opportunity to establish a record of previous reliability." *State v. Driggers*, 322 S.C. 506, 510, 473 S.E.2d 57, 59 (Ct.App.1996). "[A] non-confidential informant should be given a higher level of credibility because he exposes himself to public view and to possible criminal and civil liability should the information he supplied prove to be false." *Id.* at 511, 473 S.E.2d at 60. Additionally, an informant may be considered reliable "if he possesse[s] a special relationship and capacity to gain knowledge that should

prompt belief in the veracity of his information." *Id.* at 512, 473 S.E.2d at 60.

"In order for an affidavit in support of a search warrant to show probable cause, it must state facts so closely related to the time of the issuance of the warrant as to justify a finding of probable cause at that time." *State v. Winborne,* 273 S.C. 62, 64, 254 S.E.2d 297, 298 (1979) (internal quotation marks omitted). "Whether averments in an affidavit are sufficiently timely to establish probable cause depends on the particular circumstances of the case." *State v. Beckham,* 334 S.C. 302, 316, 513 S.E.2d 606, 613 (1999) (internal quotation marks omitted).

The affidavit in support of the search warrant in this case can be summarized as providing the following pertinent information:

1. In June 2007, two unnamed informants indicated Thompson had been supplying them with large amounts of cocaine.

2. In August 2007 and September 2008, two *named* individuals, Keith Jeter and Fred Meadows, stated Thompson was supplying them with cocaine, noting Thompson would deliver the cocaine to their homes.

3. In late 2008, another unnamed informant stated Thompson was a large scale cocaine trafficker and that Thompson had "a residence at the end of River St."

4. In January 2009, two unnamed informants stated they had purchased eighteen ounces of cocaine from Thompson, identifying Thompson in a photo line-up.

5. On February 11, 2009, a *named* individual, Jose Luis Diaz–Arroyo, who had been arrested with a kilo of cocaine, stated that his brother-in-law was supplying Thompson and that his brother-in-law had multiple kilos of cocaine delivered to Thompson at the River Street address "on several different occasions."

6. On July 30, 2009, another unnamed informant stated he was being supplied by a cousin to Thompson who was getting cocaine from Thompson. The unnamed informant made a controlled buy from the cousin by taking the cousin $4,000. The cousin left the location and was followed to the home of

Thompson's girlfriend where he met with Thompson and the cousin then left Thompson and met up with the unnamed informant at the buy location where the cousin turned over four ounces of cocaine to the unnamed informant.

7. In the six months preceding the affidavit, surveillance had been conducted on 120 River Street, and Thompson was observed on several occasions driving different vehicles to and from this location.

8. In the six months preceding the affidavit, investigators "witnessed Thompson visit this River Street address just before making cocaine deliveries throughout Spartanburg."

9. On May 11, 2010, after investigators purchased cocaine from a *named* individual, Arthur Jones, Jones began cooperating with authorities, informing them he was buying his cocaine from Thompson and that Thompson would front him about nine ounces of cocaine a month. On May 11, 2010, Jones placed a recorded call to Thompson stating he was ready to "re-up, and Thompson agreed to come by." On May 12, 2010, Jones received a phone call from Thompson asking if the individual was going to be home, and within an hour from the call Thompson arrived at Jones's home. Inside the home, Jones handed Thompson $9,000 in recorded funds and Thompson stated he would "bring the package in the morning," which Jones knew to mean Thompson would bring him cocaine. Investigators were inside Jones's home watching the money transaction take place, and the transaction was video and audio recorded.

We agree with Thompson that the affidavit fails to set forth information as to the veracity, reliability or basis of knowledge of several of the informants referenced. However, even disregarding all of the information supplied by the unnamed informants, there is substantial other evidence from named and/or eyewitness informants contained in the affidavit, and the affidavit includes information which is sufficiently closely related in time to the issuance of the search warrant so as to justify a finding of probable cause.

As to the information that, in August 2007 and September 2008, Thompson was supplying two of the informants with cocaine and delivered the cocaine to their homes, the affidavit specifically provides the names of these two individuals, Keith

Jeter and Fred Meadows. Further, this information from Jeter and Meadows, though somewhat stale, is supported by the current information concerning the Jones transaction, which occurred within the two days preceding issuance of the search warrant and showed Thompson was of the habit of delivering cocaine to his buyers at his buyers' homes. Notably, the information concerning the Arthur Jones transaction indicates both reliability and basis of knowledge as Jones is a nonconfidential informant and part of the information was actually witnessed by the authorities, thus lending credibility to Jones's information. Next, there is information in the affidavit from another named informant indicating large quantities of drugs were, in the past, delivered to the River Street address. Specifically, in February 2009, Jose Luis Diaz–Arroyo stated that his brother-in-law was supplying Thompson with multiple kilos of cocaine, which his brother-in-law had delivered to Thompson at the River Street address "on several different occasions." While this information is likewise somewhat stale, it is supported by information in the affidavit that the River Street address had been under surveillance for the preceding six months before issuance of the search warrant, and during that time Thompson was observed driving to and from the location and investigators "witnessed Thompson visit this 120 River St. address just before making cocaine deliveries throughout Spartanburg City." [4] Further, there is more current and first-hand information in the affidavit concerning

4. Notably, Thompson did not request a *Franks* hearing in order to challenge any portion of the affidavit as being false or made with reckless disregard for the truth, and at no point did Thompson ask the trial court to consider any portions of the affidavit false or made with reckless disregard. *See Franks v. Delaware*, 438 U.S. 154, 155–56, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) ("[W]here the defendant makes a substantial preliminary showing that a false statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause, the Fourth Amendment requires that a hearing be held at the defendant's request. In the event that at that hearing the allegation of perjury or reckless disregard is established by the defendant by a preponderance of the evidence, and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided and the fruits of the search excluded to the same extent as if probable cause was lacking on the face of the affidavit.").

the authorities' observation of Thompson, both coming and going from the River Street address and stopping by there before making cocaine deliveries, as well as him engaging in a monetary exchange pursuant to a drug transaction within a day of issuance of the warrant. Accordingly, the affidavit contains information from four named sources, whose veracity and/or basis of knowledge is otherwise supported in the affidavit, and additionally contains first-hand eyewitness information from the police. From this can be gleaned the following information in the search warrant affidavit to support probable cause: (1) in 2007 and 2008, Thompson was supplying cocaine and delivering cocaine to the homes of his buyers; (2) in February 2009, authorities were informed that Thompson was being supplied multiple kilos of cocaine, and the cocaine was delivered to Thompson at the River Street address; (3) in the six-month time period prior to issuance of the search warrant, investigators observed Thompson driving different vehicles to and from the River Street address, and also observed him visiting the River Street address right before making cocaine deliveries; and (4) two days before the issuance of the search warrant, an individual informed investigators he was buying nine ounces of cocaine a month from Thompson, on that date the individual spoke to Thompson on the phone indicating he was ready for more drugs, and the day before issuance of the warrant Thompson arrived at the individual's home where he received $9,000 from the individual after which Thompson agreed to bring the individual "the package" in the morning, with this monetary transaction being observed, as well as audio and video recorded, by investigators. There is very recent information in the affidavit showing Thompson's habit of selling to his buyers by taking the cocaine to his buyers' homes. Logically, Thompson would have to retrieve the drugs from some location in order to complete the Jones drug transaction, and viewing the affidavit as a whole, it would have been reasonable for the issuing judge to assume and make a "practical, common sense decision," under the totality of circumstances set forth in the affidavit, that there was a fair probability Thompson would be retrieving those drugs from the River Street address. *See United States v. Grossman,* 400 F.3d 212, 217–18 (4th Cir. 2005) (finding a search warrant affidavit which fails to include

any factual assertions directly linking the items sought to a residence can nonetheless establish a sufficient nexus between a defendant's criminal conduct and a residence linked to the defendant, and the fact that a defendant may split his time among several different homes will not render the search of the different homes invalid).

Based upon the above, a review of the matter convinces us that, under the totality of the circumstances set forth in the affidavit, the issuing judge had before him information supporting a fair probability that contraband or evidence of a crime would be found at 120 River Street, and the judge therefore had a substantial basis upon which to conclude that probable cause existed for issuance of the search warrant.

## II. Confession

Thompson also made an in limine motion to suppress his statement to police. In a *Jackson v. Denno*[5] hearing, Thompson maintained he confessed to owning the drugs found because the officer threatened to take his parents to jail if he did not. The officer denied any promises or threats were made to Thompson and particularly denied threatening that Thompson's parents would go to jail. The trial court found the State established by the greater weight of the evidence that Thompson's statement was freely and voluntarily made and, therefore, denied Thompson's motion to exclude it. Thereafter, over Thompson's objection, his taped confession and his written confession were admitted into evidence.

On appeal, Thompson contends his confession should have been suppressed because (1) it flowed from an illegal arrest and (2) it was coerced. We find no error.

### A. Illegal Arrest

First, Thompson argues his arrest was unsupported by probable cause because the affidavit in support of his arrest was deficient.

This argument is clearly not preserved for our review. In order to be preserved for appellate review, an issue must have been raised to and ruled upon by the trial

---

5. 378 U.S. 368, 84 S.Ct. 1774, 12 L.Ed.2d 908 (1964).

court. *State v. Dunbar*, 356 S.C. 138, 142, 587 S.E.2d 691, 693 (2003). "Issues not raised and ruled upon in the trial court will not be considered on appeal." *Id.* at 142, 587 S.E.2d at 693–94. "A party need not use the exact name of a legal doctrine in order to preserve it, but it must be clear that the argument has been presented on that ground." *Id.* at 142, 587 S.E.2d at 694. "For an objection to be preserved for appellate review, the objection must be made . . . with sufficient specificity to inform the [trial court] of the point being urged by the objector." *State v. Byers*, 392 S.C. 438, 444, 710 S.E.2d 55, 58 (2011). At no time did Thompson ever argue before the trial court that the arrest warrant affidavit was insufficient to establish probable cause for his arrest, much less that his confession should be suppressed on this basis. Accordingly, we affirm based on error preservation grounds.

## B. Coerced Confession

Thompson also contends his confession was improperly coerced and, because it was obtained under duress, it should have been suppressed. We disagree.

A "confession may not be extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of improper influence." *State v. Rochester*, 301 S.C. 196, 200, 391 S.E.2d 244, 246 (1990) (alteration in original) (internal quotation marks omitted). A police threat to arrest family members unless a defendant confesses to a crime could render the defendant's confession involuntary if it in fact occurred. *State v. McClure*, 312 S.C. 369, 371, 440 S.E.2d 404, 405 (Ct.App. 1994). However, the question of the voluntariness of such a confession can come down to a question of credibility, which may be resolved by the trial court in favor of the officers. *Id.* at 371–72, 440 S.E.2d at 405–06. "On appeal, the conclusion of the trial [court] on issues of fact as to the voluntariness of a confession will not be disturbed unless so manifestly erroneous as to show an abuse of discretion." *Rochester*, 301 S.C. at 200, 391 S.E.2d at 247. "When reviewing a trial court's ruling concerning voluntariness, [the appellate court] does not reevaluate the facts based on its own view of the preponderance of the evidence, but simply determines whether the trial court's

ruling is supported by any evidence." *State v. Saltz,* 346 S.C. 114, 136, 551 S.E.2d 240, 252 (2001).

Here, though Thompson testified he was threatened with the arrest of his parents if he did not confess to ownership of the drugs, Investigator Raymond denied any promises or threats were made to Thompson and particularly denied threatening that Thompson's parents would go to jail. As in *McClure,* the issue boils down to one of credibility. Accordingly, based upon the record before us, there is evidence to support the trial court's ruling and we find no error.

## III. Directed Verdict on the Weapons Charge

At trial, the State presented evidence that, along with cocaine located in the detached garage and marijuana located in both the house and in the detached garage, numerous weapons were found during the search of the house at 120 River Street, including an Intratec 9mm pistol. A trace on the pistol showed it was purchased by Thompson on November 17, 2000, at a pawn shop. The police had no documentation linking Thompson to any of the other weapons. One of the bags of marijuana found in the house was located in the same bedroom as the pistol that was registered to Thompson.

Following the presentation of evidence by the State, Thompson moved for a directed verdict with respect to the weapons charge, asserting the State failed to present evidence (1) he constructively possessed any of the weapons found in the home or (2) that he was engaged in a violent crime. The solicitor argued one of the firearms found there was registered to Thompson. The trial court found there was some evidence tending to establish the elements of the crime and, therefore, denied the motion. After Thompson testified in his own defense and rested his case, he renewed his motion for a directed verdict as to the weapons charge, arguing his testimony showed the only weapon linked to him was given by Thompson to his father. He maintained the State failed to meet its burden of (1) linking him to any weapons found and (2) showing he was "guilty in any way of a violent crime." The trial court again denied the motion.

On appeal, Thompson argues his weapons conviction should be reversed because the State (1) failed to prove he construc-

tively possessed any weapon and (2) failed to establish any nexus between any weapon and any violent crime, as required by *State v. Whitesides*, 397 S.C. 313, 725 S.E.2d 487 (2012). We find no reversible error.

## A. Constructive Possession

■ Thompson argues, of the various weapons introduced by the State that had been found at the River Street home, the State only attempted to link the 9mm pistol to him, and the State's witnesses conceded he was not present when the pistol was found and he did not reside at the home. He further notes, although he initially testified the pistol that was purchased ten years earlier was his, he explained he had given this gun to his father. Thus, he maintains there was no direct or circumstantial evidence to show he constructively possessed any weapon found at the River Street home, and the trial court therefore erred in denying his motion for directed verdict on the weapons charge. We disagree.

■ "When reviewing a denial of a directed verdict, [an appellate court] views the evidence and all reasonable inferences in the light most favorable to the state." *State v. Weston*, 367 S.C. 279, 292, 625 S.E.2d 641, 648 (2006). "If there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the [appellate court] must find the case was properly submitted to the jury." *Id.* at 292–93, 625 S.E.2d at 648.

In *State v. Halyard*, 274 S.C. 397, 264 S.E.2d 841 (1980), "the South Carolina Supreme Court resolved the issue of whether a person not in actual possession of a firearm could nevertheless be convicted for possession of the firearm." *State v. Jennings*, 335 S.C. 82, 86, 515 S.E.2d 107, 109 (Ct.App.1999). In *Halyard*, the court held, "[t]o prove constructive possession [of an item], the State must show a defendant had dominion and control, or the right to exercise dominion and control over the [item]." 274 S.C. at 400, 264 S.E.2d at 842. "Constructive possession may be established through either direct or circumstantial evidence, and possession may be shared." *Jennings*, 335 S.C. at 87, 515 S.E.2d at 109.

We believe the evidence, viewed in a light most favorable to the State, created a jury issue as to whether Thompson was in constructive possession of the pistol. Thompson admitted that he stayed at his parents' home "every now and then," he had a key to the house and the gate, he could come and go from the house whenever he wanted whether his parents were there or not, and the car in the garage—where a large amount of the cocaine was found—belonged to Thompson's friend and was in his parents' garage because Thompson was working on it. Thompson also acknowledged he helped build a fence around the house and helped set up the home's security system. Also, Lieutenant Cooper, who oversaw the search of 120 River Street, testified they had information Thompson had control of the residence. Further, though Thompson claimed he gave the pistol found in the home to his father, the State presented evidence that Thompson bought the pistol and it was registered to him. Accordingly, we find the State presented evidence of Thompson's constructive possession of the pistol, and the trial court therefore did not err in declining to grant a directed verdict on this basis.

### B. Nexus to Violent Crime

Thompson also argues, even if the State presented sufficient evidence that he constructively possessed a firearm, it failed to provide a sufficient nexus between any firearm and any violent crime. Citing *Whitesides,* Thompson contends the State failed to show any firearm was accessible to him, that he ever let anyone know he carried a weapon, or that any weapon ever provided him with a defense against potential robbers. We find this argument is not properly preserved.

As noted, in order to be preserved for appellate review, a matter must have been raised to and ruled upon by the trial court, and arguments which have not been raised to and ruled upon by the trial court will not be considered on appeal. *Dunbar,* 356 S.C. at 142, 587 S.E.2d at 693–94. Though "[a] party need not use the exact name of a legal doctrine in order to preserve it, but it must be clear that the argument has been presented on that ground." *Id.* at 142, 587 S.E.2d at 694. Further, "[a] party may not argue one ground at trial and an alternate ground on appeal." *Id.*

 When trial counsel made his motion for a directed verdict with respect to the weapons charge, he argued the State "would have had to have proven constructive possession of those weapons, and they would have to prove also of course that he was engaged in a violent crime. We believe the State has failed to meet [its] burden in that respect." He then went on to present argument concerning only the State's failure to show constructive possession. When trial counsel renewed his motion for directed verdict, he stated as to the weapons charge as follows:

> [T]he only link with any of the weapons is the purchase of a 9mm pistol which my client has freely admitted that he did not have possession of, constructive or actual, at the time of his arrest and which was found in his father's house which had been given to him by my client.
>
> Again, I don't believe the State has met its burden of linking him with any of the weapons and for that matter showing that he was guilty in any way of a violent crime.

While Thompson's argument on appeal as to constructive possession is properly preserved for our review, his appellate argument concerning the State's failure to show a *nexus* to a violent crime is not. At most, trial counsel argued the State failed to present evidence Thompson *committed* a violent crime. Thus, Thompson never asserted to the trial court, as he does on appeal, that the State was required to show a nexus between a violent crime and his actual or constructive possession of a firearm during its commission.[6]

**CONCLUSION**

Based upon the foregoing, we affirm the trial court's denial of Thompson's motion to suppress all the evidence, finding under the totality of the circumstances the search warrant affidavit set forth facts from which the issuing judge could conclude there was a fair probability that drugs would be

---

6. While it is true Thompson's trial began January 23, 2012, and the opinion in *Whitesides* was not filed until April 4, 2012, just as the appellant in *Whitesides* raised the issue to the trial court that it was necessary for the weapon in question to facilitate the trafficking crime and mere possession of a weapon would not be sufficient to support a possession of a weapon during the commission of a violent crime charge, Thompson could have made such an argument to the trial court in his case, but failed to do so.

found at 120 River Street, and, therefore, the issuing judge had a substantial basis upon which to conclude that probable cause existed. We also affirm the admission of Thompson's confession and the denial of his directed verdict motion.

**AFFIRMED.**

WILLIAMS, J., concurs.

FEW, C.J., dissenting.

I agree with the majority the trial court correctly admitted Thompson's confession into evidence and denied his motion for a directed verdict on the weapons charge. I also agree with the circuit judge who issued the warrants—and the trial court—the officers had probable cause to search Thompson's residence, his business, and his girlfriend's residence, and to arrest Thompson on drug charges. I do not agree, however, the officers had probable cause to search the River Street home. On this point, I respectfully dissent. Because the vast majority of the drugs for which Thompson was convicted were seized from the River Street home, I would find the error of denying his motion to suppress that evidence prejudiced Thompson, and I would reverse his convictions.

I begin my analysis by emphasizing two important categories of facts. The first relates to the locations where all of this took place. The River Street home is Thompson's parents' home—not Thompson's. It is located in downtown Spartanburg. Thompson lived in Fountain Inn, in a different county. Thompson's girlfriend—whose home was also searched—lived approximately seven miles from the River Street home. Thompson's business—which was searched—was located in Boiling Springs, also miles from the River Street home.

The second category relates to timing. The affidavit submitted in support of the warrant to search the River Street home shows Thompson engaged in extensive drug-related activity from at least June 2007 through July 30, 2009, much of which is directly connected to the River Street home. The affidavit also shows Thompson was engaged in drug-related activity on May 11 and 12, 2010. However, the affidavit—dated May 13, 2010—contains no specific facts showing any connection between Thompson's drug-related activity and the

River Street home after February 11, 2009. The only evidence of such a connection is found in the following conclusory statements:

Over the past 6 months the Spartanburg County Sheriff's Office Narcotics Division has conducted surveillance on 120 River St. and on several occasions has seen Thompson driving different vehicles [including three vehicles connected to his drug activity] to and from this location.

Over the past 6 months Investigators have witnessed Thompson visit this 120 River St. address just before making cocaine deliveries throughout Spartanburg City.

While the affidavit contains extensive and specific evidence of Thompson's drug-related activity over a long period of time, these non-specific references to Thompson's activity at the River Street home after February 2009 do not provide a substantial basis to support a finding of probable cause that evidence of his crimes would be found at River Street in May 2010. *See State v. Kinloch*, 410 S.C. 612, 617, 767 S.E.2d 153, 155 (2014) (stating "circuit court judges must determine whether the issuing magistrate had a substantial basis upon which to conclude that probable cause existed"); *see also United States v. Lalor*, 996 F.2d 1578, 1582 (4th Cir.1993) ("In determining whether a search warrant is supported by probable cause, the crucial element is not whether the target of the search is suspected of a crime, but whether it is reasonable to believe that the items to be seized will be found in the place to be searched.").

In fact, the specific detail in the affidavit of Thompson's activities before July 2009 and during May 2010 compared with the conclusory descriptions of his activities in the interim has the opposite effect of supporting probable cause. The statements that officers "on several occasions ha[ve] seen Thompson driving different vehicles . . . to and from" River Street and "Investigators have witnessed Thompson visit . . . 120 River St[reet] . . . just before making cocaine deliveries" are representations that officers saw these events, and thus demonstrate the officers had access to the same level of detail the affidavit contains of other events. This comparison raises serious questions as to why that specific detail is lacking for the fifteen months immediately preceding the search. Importantly, the circuit judge who signed the search warrant did not

question the officer to supplement the information provided in the affidavit.

The officers clearly believed there was a connection between Thompson's drug-related activities and the River Street home. In retrospect, they were correct. The Fourth Amendment, however, does not permit officers to make the decision that probable cause exists to support a search warrant—that decision must be made by the judge who issues the warrant. Otherwise, " 'the inferences from the facts which lead to the complaint' will be drawn not 'by a neutral and detached magistrate,' as the Constitution requires, but instead, by a police officer 'engaged in the often competitive enterprise of ferreting out crime.' " *State v. Johnson,* 302 S.C. 243, 248, 395 S.E.2d 167, 169 (1990) (quoting *Aguilar v. Texas,* 378 U.S. 108, 115, 84 S.Ct. 1509, 1514, 12 L.Ed.2d 723, 729 (1964)).

In my opinion, this affidavit did not provide the judge with a substantial basis for a finding of probable cause that evidence of Thompson's drug-related activity would be found at River Street. I respectfully dissent.